

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2018 Grand Jury

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

TAMAR TATARIAN
     aka "Tamar Agajanian,"

        Defendant.

No. CR. **18CR00361-JFW**

I N D I C T M E N T

[18 U.S.C. § 1347: Health Care
Fraud; 18 U.S.C. § 2(b): Causing
an Act to be Done; 18 U.S.C.
§ 1343: Wire Fraud; 18 U.S.C.
§§ 982(a)(7), 981(a)(1)(C); 28
U.S.C. § 2461(c): Criminal
Forfeiture]

The Grand Jury charges:

COUNT ONE

[18 U.S.C. §§ 1347, 2(b)]

A.  INTRODUCTORY ALLEGATIONS

    At all times relevant to this Indictment:

    1.    Vako Minas Agajanian d/b/a Akhtamar Pharmacy
("Akhtamar Pharmacy") was a pharmacy located at 1729 E.
Washington Blvd., Pasadena, California 91104, within the Central
District of California.

    2.    Defendant TAMAR TATARIAN, also known as "Tamar
Agajanian" ("TATARIAN"), was a resident of Los Angeles County

1   and an owner of Akhtamar Pharmacy from September 2015 through
2   the present.

3       3.   Confidential Cooperating Witness ("CW") purported to
4   be the owner of a prescription drug wholesaler, International
5   Pharmaceutical Services ("IPS"), located in San Mateo,
6   California.

7   The Medicare Program

8       4.   Medicare was a federal health care benefit program,
9   affecting commerce, that provided benefits to individuals who
10  were 65 years and older or disabled.   Medicare was administered
11  by the Centers for Medicare and Medicaid Services ("CMS"), a
12  federal agency under the United States Department of Health and
13  Human Services.

14      5.   Individuals who qualified for Medicare benefits were
15  referred to as Medicare "beneficiaries."   Each beneficiary was
16  given a unique health insurance claim number ("HICN").

17      6.   Medicare programs covering different types of benefits
18  were separated into different program "parts."   Part D of
19  Medicare (the "Medicare Part D Program") subsidized the costs of
20  prescription drugs for Medicare beneficiaries in the United
21  States.   The Medicare Part D Program was enacted as part of the
22  Medicare Prescription Drug, Improvement, and Modernization Act
23  of 2003 and went into effect on January 1, 2006.

24      7.   In order to receive Medicare Part D program benefits,
25  a beneficiary had to enroll in a Medicare drug plan.   Medicare
26  drug plans were operated by private companies approved by
27  Medicare.   Those companies were often referred to as drug plan
28  "sponsors."   A beneficiary in a Medicare drug plan could fill a

2

prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

8.   A pharmacy could participate in the Medicare Part D program by entering into a retail network agreement directly with a drug plan; with one or more Pharmacy Benefit Managers ("PBMs"); or with a Pharmacy Services Administration Organization ("PSAO"), which would, in turn, contract with PBMs on behalf of the pharmacy.   A PBM acted on behalf of one or more drug plans.   Through a plan's PBM, a pharmacy could join the drug plan's network.   When a Medicare Part D program beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim either directly to the drug plan or to a PBM that represented the beneficiary's Medicare drug plan.   The drug plan or PBM determined whether the pharmacy was entitled to payment for each claim and periodically paid the pharmacy for outstanding claims.   The drug plan's sponsor reimbursed the PBM for its payments to the pharmacy.

9.   A pharmacy could also submit claims to a Medicare drug plan to whose network the pharmacy did not belong.   Submission of such out-of-network claims was not common and often resulted in smaller payments to the pharmacy by the drug plan sponsor.

10.   Medicare, through CMS, compensated Medicare drug plan sponsors.   Medicare paid the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans.   Such payments were called capitation fees.   The capitation fee was adjusted periodically based on various factors, including the beneficiary's medical conditions.   In addition, in some cases where a sponsor's expenses for a beneficiary's prescription

3

drugs exceeded that beneficiary's capitation fee, Medicare reimbursed the sponsor for a portion of those additional expenses.

11.   Medicare and Medicare drug plans were health care benefit programs, as defined by Title 18, United States Code, Section 24(b).

B.   THE SCHEME TO DEFRAUD

12.   Beginning no later than in or around October 2015, and continuing through at least in or around October 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant TATARIAN, together with others known and unknown to the Grand Jury, knowingly, willfully, and with intent to defraud, executed and attempted to execute a continuing scheme and artifice: (a) to defraud health care benefit programs, namely, Medicare and Medicare drug plans, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from Medicare and Medicare drug plans by means of materially false and fraudulent pretenses and representations and the concealment of materials facts in connection with the delivery of and payment for health care benefits, items, and services.

C.   MANNER AND MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

13.   The fraudulent scheme operated, in substance, as follows:

a.   Defendant TATARIAN knowingly and willfully submitted and caused to be submitted to Medicare drug plans false and fraudulent claims for drugs, which claims falsely represented that Akhtamar Pharmacy dispensed prescription drugs to Medicare Part D program beneficiaries when, in fact, defendant TATARIAN did not purchase these drugs from prescription drug wholesalers and Akhtamar Pharmacy did not dispense these drugs to Medicare beneficiaries.

b.   As a result of such false and fraudulent claims, Medicare drug plans made payments funded by Medicare to Akhtamar Pharmacy's Bank of America bank account ending in -6702.

c.   From October 2015 to October 2017, Medicare and Medicare drug plans sponsors paid Akhtamar Pharmacy approximately $6,539,315.  At least approximately $1,352,821 of these payments were caused by and resulted from this fraudulent scheme.

d.   In or about May 2017, defendant TATARIAN contacted CW to request false wholesale invoices for certain prescription drugs in order to conceal the fact that defendant TATARIAN had not purchased the prescription drugs from prescription drug wholesalers but had submitted false and fraudulent claims to health care benefit programs, including Medicare drug plans. The purpose of these false wholesale invoices was to support the false and fraudulent pretense that Akhtamar Pharmacy had purchased the prescription drugs that it represented it had dispensed to beneficiaries.

1        e.   On or about May 5, 2017, defendant TATARIAN sent CW a 4-page handwritten list of prescription drugs dated October 2015 for which defendant TATARIAN was requesting false wholesale invoices.

f.   On or about May 15, 2017, defendant TATARIAN sent CW a 17-page handwritten list of prescription drugs dated October 2015 through December 2015 for which defendant TATARIAN was requesting false wholesale invoices.

g.   On or about May 26, 2017, defendant TATARIAN sent CW a 28-page handwritten list of prescription drugs dated January 2016 through February 2017 for which defendant TATARIAN was requesting false wholesale invoices.

h.   On or about August 16, 2017, defendant TATARIAN gave CW a 4-page handwritten list of prescription drugs dated May 2017 through July 2017 for which defendant TATARIAN was requesting false wholesale invoices.

COUNTS TWO THROUGH THREE

[18 U.S.C. § 1343]

14.   The Grand Jury incorporates by reference and re-alleges paragraphs 1 through 11 and 13 above as though set forth in their entirety herein.

A.   THE SCHEME TO DEFRAUD

15.   Beginning no later than on or about May 5, 2017, and continuing through on or about May 15, 2017, in Los Angeles County, within the Central District of California and elsewhere, defendant TATARIAN, together with others known and unknown to the Grand Jury, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud Medicare and Medicare drug plans as to material matters, and to obtain money and property from Medicare and Medicare drug plans by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts, as described in paragraph 13 of this Indictment.

B.   USE OF THE WIRES

16.   On or about the dates set forth below, within the Central District of California and elsewhere, defendant TATARIAN, for the purpose of executing and attempting to execute the above-described scheme to defraud, transmitted and caused the transmission of the following items by means of wire communication in interstate commerce:

| COUNT | DATE | ITEM |
|-------|------|------|
| TWO | May 5, 2017 | Email defendant TATARIAN caused to be transmitted (via computer servers outside the State of California) to CW (located within the State of California), with lists of prescription drugs dated October 2015 attached. |
| THREE | May 15, 2017 | Email defendant TATARIAN caused to be transmitted (via computer servers outside the State of California) to CW (located within the State of California), with lists of prescription drugs dated October – December 2015 attached. |

FORFEITURE ALLEGATION

[18 U.S.C. §§ 982(a)(7), 981(a)(1)(C); 28 U.S.C. § 2461(c)]

17.     Pursuant to Rule 32.2(a) Fed. R. Crim. P., notice is hereby given to defendant TAMAR TATARIAN ("defendant") that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of defendant's conviction under any of the Counts One through Three of this Indictment.

18.     Defendant shall forfeit to the United States the following property:

        a.     All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense set forth in any of Counts 1 through 3 of this Indictment; and

        b.     A sum of money equal to the total value of the property described in subparagraph a. above.

19.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court;

1  (d) has been substantially diminished in value; or (e) has been

2  commingled with other property that cannot be divided without

3  difficulty.

A TRUE BILL

4

5  _/s/_____

6  Foreperson

7  NICOLA T. HANNA
   United States Attorney
8

9

10  LAWRENCE S. MIDDLETON
    Assistant United States Attorney
11  Chief, Criminal Division

12  RANEE A. KATZENSTEIN
    Assistant United States Attorney
13  Chief, Major Frauds Section

14
    STEPHEN A. CAZARES
15  Assistant United States Attorney
    Deputy Chief, Major Frauds Section
16

17  ROBERT ZINK
    Acting Principal Deputy Chief, Fraud Section
18  United States Department of Justice

19  DIIDRI ROBINSON
    Assistant Chief, Fraud Section
20  United States Department of Justice

21  ALEXIS GREGORIAN
22  Trial Attorney, Fraud Section
    United States Department of Justice

23

24

25

26

27

28