NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
ALEXIS D. GREGORIAN
A. BRENDAN STEWART
Trial Attorneys
United States Department of Justice
Fraud Section, Criminal Division
     4811 Airport Plaza Drive, 5th Floor
     Long Beach, California 90815
     Telephone: (202) 768-1172
     Facsimile: (562) 982-1799
     E-mail:    alexis.gregorian@usdoj.gov
                brendan.stewart@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:18-CR-00361-JFW |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR |
| v. | |
| TAMAR TATARIAN aka "Tamar Agajanian," | Hearing: February 25, 2019 Time: 8:30 a.m. Courtroom: 7A |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, the Fraud Section of the United States Department of Justice, and Trial Attorneys Alexis D. Gregorian and A. Brendan Stewart, hereby files its Sentencing Memorandum with respect to defendant Tamar Tatarian and its responses to defendant's objections to the Presentence Investigation Report ("PSR").

//

1       This Sentencing Memorandum is based upon the attached memorandum

2  of points and authorities, the files and records in this case, the

3  PSR, and such further evidence and argument as the Court may permit

4  at the sentencing hearing.

5  Dated: February 11, 2019          Respectfully submitted,

6                              NICOLA T. HANNA
                                United States Attorney

7

8                              LAWRENCE S. MIDDLETON
                                Assistant United States Attorney
                                Chief, Criminal Division

9

10                            /s/
                                ALEXIS D. GREGORIAN
                                A. BRENDAN STEWART

11                            Trial Attorneys, Fraud Section

12                            Attorneys for Plaintiff
                            UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION...............................................1

II.   OFFENSE CONDUCT............................................1

III.  GUIDELINES CALCULATION.....................................5

    A.    Loss Amount..........................................5

    B.    Federal Health Care Offense..........................8

    C.    Sophisticated Means..................................9

    D.    Abuse of a Position of Trust........................10

IV.   RESTITUTION...............................................11

    A.    The Court Must Order Restitution in this Case.......11

    B.    Restitution Is Due and Payable Immediately, but
        Defendant May Pay According to the Recommended
        Schedule While the Government Pursues Other Avenues to
        Satisfy the Restitution Order.......................13

V.    ANALYSIS OF THE SECTION 3553(a) FACTORS...................16

    A.    Nature and Circumstances of the Offense.............17

    B.    History and Characteristics of the Defendant........18

    C.    Deterrence, Promoting Respect for the Law, and
        Punishing Defendant for Her Crime...................20

VI.   CONCLUSION................................................21

1

**TABLE OF AUTHORITIES**

2

**CASES**

3  Duncan v. Walker, 533 U.S. 167, 174 (2001).........................13

4  United States v. Booker, 543 U.S. 220 (2005).......................16

5  United States v. Carty, 520 F.3d 984 (9th Cir. 2008)..............16

6  United States v. Gunning, 339 F.3d 948 (9th Cir. 2003)............14

7  United States v. Hawkins, 392 F. Supp. 2d 757 (W.D. Va. 2005)......15

8  United States v. Hickey, 580 F.3d 922, 932 (9th Cir. 2009).........7

9  United States v. James, 312 F. Supp. 2d 802 (E.D. Va. 2004).......15

10 United States v. Jennings, 711 F.3d 1144 (9th Cir. 2013)...........9

11 United States v. Laurienti, 731 F.3d 967 (9th Cir. 2013)..........10

12 United States v. Martin, 278 F.3d 988 (9th Cir. 2002).............11

13 United States v. Menasche, 348 U.S. 528, 538-39 (1955)............13

14 United States v. Newman, 148 F.3d 871, 878 (7th Cir. 1998)........20

15 United States v. Peyton, 353 F.3d 1080 (9th Cir. 2003).............6

16 United States v. Ross, 310 F. App'x 160 (9th Cir. 2009)...........11

17 United States v. Sake, 191 Fed. App'x 401, 403 (6th Cir. 2006).....19

18 United States v. Tanke, 743 F.3d 1296, (9th Cir. 2014).............9

19 United States v. Torlai, 728 F.3d 932, 946 n.13 (9th Cir. 2013).....7

20 United States v. Zolp, 479 F.3d 715, 719 (9th Cir. 2007)...........7

21

22

**FEDERAL STATUTES**

23

24 18 U.S.C. § 1343..................................................12

25 18 U.S.C. § 1347..................................................12

26 18 U.S.C. § 3553..............................................16, 18, 21

27 18 U.S.C. § 3555..................................................16

28 18 U.S.C. § 3572..................................................11

18 U.S.C. § 3663A..................................................12

18 U.S.C. § 3664........................................11, 12, 13

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.   INTRODUCTION**

3         On December 14, 2018, a jury found defendant Tamar Tatarian

4    ("defendant") guilty of one count of health care fraud, in violation

5    of Title 18, United States Code, Section 1347, and two counts of wire

6    fraud, in violation of Title 18, United States Code, Section 1343,

7    charged in a June 13, 2018 indictment (Dkt. 1).  The United States

8    Probation Office ("USPO") issued its Presentence Investigation Report

9    ("PSR") on January 22, 2019.  (Dkt. 102.)  The government filed

10   objections to the PSR on February 5, 2019.  (Dkt. 103.)  Defendant

11   filed her objections to the PSR on February 8, 2019.[1]  (Dkt. 104.)

12        For the reasons set forth below, the government respectfully

13   submits that the Court should find that the total offense level for

14   defendant is 28.  Based on the finding in the PSR that defendant is

15   in criminal history category I, the resulting advisory guidelines

16   range is 78-97 months.  The government submits that a sentence of 78

17   months of imprisonment, followed by three years of supervised

18   release, a restitution order of $1,537,710.73, and a special

19   assessment of $300 are sufficient, but not greater than necessary, to

20   provide just punishment in this case, promote respect for the law,

21   and deter defendant and others from committing similar crimes in the

22   future.

23   **II.  OFFENSE CONDUCT**

24        The evidence presented at trial demonstrated that defendant and

25   her husband were the owners of Akhtamar Pharmacy in Pasadena,

26

27   _____
     [1] Rule 32 of the Federal Rules of Criminal Procedure provides that
     the parties must state in writing any objections to the PSR within 14
28   days after receiving it.  Fed. R. Crim. P. 32(f)(1).  Defendant's
     objections are untimely.

     1

California, which opened in September 2015.  (PSR ¶ 8; Declaration of Alexis D. Gregorian (hereinafter "Gregorian Decl."), Exh. A (Gov't Trial Exh. 1); Trial Tr. 210:12-212:14, 258:15-259:8 (testimony of James Zee).)  Defendant, a licensed pharmacy technician, was the manager of the pharmacy.  (PSR ¶ 8; Trial Tr. 209:22-210:11 (testimony of James Zee).)  The majority of Akhtamar Pharmacy's patients had prescription drug insurance coverage through Medicare Part D.  (PSR ¶ 8; Trial Tr. 216:5-9 (testimony of James Zee).)  The Medicare Program and Medicare drug plans are federal health care benefit programs.  (PSR ¶ 9; Trial Tr. 173:15-174:17 (testimony of Anna Godik); Dkt. 49, Exh. A (stipulation regarding facts).)

Beginning shortly after she opened Akhtamar Pharmacy, but no later than October 2015, defendant began submitting and causing the submission of false and fraudulent claims to Medicare Part D drug plans for certain prescription drugs.  (PSR ¶ 10; Gregorian Decl., Exh. B (transcript of Gov't Trial Exh. 10A).)  These claims falsely represented that Akhtamar Pharmacy had dispensed certain prescription drugs to Medicare Part D patients when, in fact, defendant had not purchased enough of those drugs from prescription drug wholesalers and so could not have dispensed the drugs to the patients.  (PSR ¶ 10; Gregorian Decl., Exh. B (transcript of Gov't Trial Exh. 10A); Trial Tr. 181:18-24 (testimony of Anna Godik).)

Following an audit by Medi-Cal in February 2017, which put defendant on notice that Akhtamar Pharmacy's drug purchases were being scrutinized, defendant attempted to conceal the fraud by creating false and fraudulent invoices, which reflected wholesale drug purchases by Akhtamar Pharmacy that never took place.  (PSR ¶¶ 11-12; Trial Tr. 208:24-209:3, 216:17-217:23 (testimony of James

2

Zee); Trial Tr. 270:9-271:3, 271:16-272:20 (testimony of Armen Pogossian); Trial Tr. 304:4-12, 331:25-332:4 (testimony of Stanley Azrilyan).)  On May 5, 2017, May 15, 2017, May 26, 2017, and August 16, 2017, defendant provided to a confidential cooperating witness ("CCW"), by email and in person, handwritten lists of prescription drugs that the defendant asked be reflected on fake wholesale invoices.  (PSR ¶ 13; Gregorian Decl., Exhs. C-F (Gov't Trial Exhs. 11, 16, 22, 27); Trial Tr. 339:3-341:14, 352:1-353:4, 363:21-365:14, 378:12-380:4 (testimony of Stanley Azrilyan).)  At defendant's direction, the CCW then created and gave to defendant fake backdated wholesale invoices that reflected the handwritten lists that defendant gave the CCW, thus making it appear as if defendant had actually purchased the drugs for which she had billed Medicare, when, in fact, she had not.  (PSR ¶ 13; Gregorian Decl., Exhs. G-I (Gov't Trial Exhs. 24, 28, 30); Trial Tr. 346:16-348:15; 370:2-13, 377:6-23, 381:19-24) (testimony of Stanley Azrilyan).)

In February 2018, the Medicare Drug Integrity Contractor (the "NBI MEDIC") performed a reconciliation that compared the prescription drug claims submitted by Akhtamar Pharmacy to Medicare drug plans for 79 drugs, to the amount of those 79 drugs Akhtamar Pharmacy purchased from its wholesalers for the time period October 2, 2015, through October 30, 2017.  (PSR ¶ 15; Gregorian Decl., Exh. J (Gov't Trial Exh. 8); Trial Tr. 412:19-414:13 (testimony of Anna Godik).)  The NBI MEDIC determined that, for 64 of the 79 drugs reviewed, Akhtamar Pharmacy had purchased insufficient drugs from its wholesalers (i.e., had a shortage) and calculated that that shortage resulted in at least an approximate $1,351,843 loss to Medicare.

1    (PSR ¶ 15; Gregorian Decl., Exh. J (Gov't Trial Exh. 8); Trial Tr.

2    422:20-423:16 (testimony of Anna Godik).)

3         In December 2018, the NBI MEDIC performed an updated

4    reconciliation, which analyzed claims submitted by Akhtamar Pharmacy

5    to Medicare drug plans for the same 79 drugs for an additional 8

6    months, extending the period of time of the reconciliation through

7    the date the defendant was arrested, from October 2, 2015 through

8    June 22, 2018.  (PSR ¶ 16; Gregorian Decl., Exh. K.)  This updated

9    reconciliation determined that Akhtamar Pharmacy had a shortage for

10   64 of the 79 drugs reviewed and calculated that that shortage

11   resulted in at least an approximate $1,537,710.73 loss to Medicare.

12   (PSR ¶ 16; Gregorian Decl., Exh. K.)

13        Between October 2, 2015, and June 22, 2018, Akhtamar Pharmacy

14   was paid by Medicare a total of $5,313,537.80 for the 79 drugs

15   analyzed by the NBI MEDIC, and a total of $8,551,253.33 for all drug

16   claims submitted to Medicare.  (PSR ¶ 17; Gregorian Decl., Exh. K.)

17        Defendant generally objects to paragraphs 7-17 of the PSR as not

18   conforming "to the testimony and evidence at trial" and claims that

19   the paragraphs are "squarely contradicted by the trial evidence."

20   (Dkt. No. 104.)  Defendant fails to provide any support for her

21   assertions.  As demonstrated above, the testimony and exhibits

22   introduced at trial, as well as Exhibit K to this filing, amply

23   support the description of the offense conduct in the PSR.  The

24   government therefore submits that the Court should adopt the PSR's

25   description of defendant's offense conduct, paragraphs 7-17, as

26   findings of fact.

27

28

## III. GUIDELINES CALCULATION

In the PSR, the USPO calculated defendant's total offense level as 26, with an advisory guidelines range of 63-78 months.  (PSR ¶ 95.)  On February 5, 2019, the government objected to the PSR's guidelines calculation for defendant insofar as the PSR does not apply a 2-level enhancement for the commission of an offense involving sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C). (Dkt. 103.)  The government otherwise agrees with the total offense calculation in the PSR.

The government submits that the guidelines range for defendant should be calculated as follows:

| | | |
|---|---|---|
| Base Offense Level: | 6 | U.S.S.G. § 2B1.1(a)(2) |
| Loss amount:<br>More than $1.5 million but less<br>than $3.5 million | 16 | U.S.S.G. §§ 2B1.1(b)(1)(I) |
| Federal Health Care Offense | 2 | U.S.S.G. §2B1.1(b)(7) |
| Sophisticated Means | 2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Abuse of a Position of Trust | 2 | U.S.S.G. § 3B1.3 |

Accordingly, defendant's total offense level should be 28.

### A.   Loss Amount

The government agrees with the USPO's determination in the PSR that a 16-level enhancement applies under U.S.S.G. § 2B1.1(b)(1)(I) based on the loss to Medicare of at least approximately $1,537,710.73.  This loss figure is based on the updated reconciliation performed by the NBI MEDIC. (PSR ¶ 16; Gregorian Decl., Exh. K.)

Loss under the Sentencing Guidelines is "the greater of actual or intended loss." U.S.S.G. § 2B1.1, cmt. n. 3(A). "Actual loss"——at

5

issue in this case——"means the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1, cmt. n. 3(A)(i).  "Pecuniary harm" is "harm that is monetary or that otherwise is readily measurable in money . . . ."  U.S.S.G. § 2B1.1 cmt. n.3(A)(iii).  Harm is reasonably foreseeable if "the defendant knew or, under the circumstances, reasonably should have known, [that the harm] was a potential result of the offense."  U.S.S.G. § 2B1.1, cmt. n. 3(A)(iv).

In the context of sentencing, a district court is not limited to offense conduct, but rather may consider all of the defendant's "relevant conduct" in calculating loss under § 2B1.1. U.S.S.G. § 1B1.3.  Pertinent to this case, relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ... that occurred during the commission of the offense of conviction," U.S.S.G. § 1B1.3(a)(1)(A), and "all harm that resulted from [such] acts and omissions," U.S.S.G. § 1B1.3(a)(3).  Because relevant conduct may include a broader range of conduct than the underlying offense conduct, a district court may "properly consider[] charged, uncharged, and acquitted conduct."  United States v. Peyton, 353 F.3d 1080, 1089 (9th Cir. 2003), overruled on other grounds by United States v. Contreras, 593 F.3d 1135, 1136 (9th Cir. 2010) (en banc) (per curiam).

The indictment alleges that beginning in or around October 2015, and continuing through at least in or around October 2017, defendant submitted and caused to be submitted false and fraudulent claims to Medicare.  As discussed above, after conducting its initial reconciliation in February 2018, which found that Akhtamar Pharmacy

6

had a shortage that resulted in a loss of approximately $1,351,843 to Medicare for false claims submitted between October 2015 and October 2017, the NBI MEDIC performed an updated reconciliation in December 2018 for the extended time period of October 2, 2015 through June 22, 2018.  That updated reconciliation determined that Akhtamar Pharmacy had a shortage for 64 of the 79 drugs reviewed, which resulted in a loss to Medicare of at least an approximately $1,537,710.73. (Gregorian Decl., Exh. K.)  The government submits that the appropriate measure of loss in this case is $1,537,710.73 as determined by the updated reconciliation and set forth in the PSR. This loss figure accounts for the offense conduct charged in the indictment, as well as defendant's relevant conduct.

Defendant objects to the NBI MEDIC's updated reconciliation as "not sufficiently reliable" because the $1,537,710.73 loss amount was not reflected in the trial record or found by the jury. (Dkt. 104.) However, the loss amount is determined by the Court at sentencing, not by the jury at trial.  See United States v. Hickey, 580 F.3d 922, 932 (9th Cir. 2009).  A district court "need not make its loss calculation with absolute precision; rather, it need only make a reasonable estimate of the loss based on the available information." United States v. Zolp, 479 F.3d 715, 719 (9th Cir. 2007) (citing U.S.S.G. § 2B1.1 cmt. n.3(C)).  "[A]ll that is required is that the government prove the loss by a preponderance of the evidence." United States v. Torlai, 728 F.3d 932, 946 n.13 (9th Cir. 2013).  The government submits that the testimony provided at trial by Anna Godik regarding the reconciliation methodology (Trial Tr. 412:16-415:13, 422:20-423:16) and the updated reconciliation (Gregorian Decl., Exh. K) demonstrate the actual loss by a preponderance.

Defendant further objects to the $1,537,710.73 loss calculation because she claims that the "preexisting stock" of prescription drugs at Akhtamar Pharmacy and the "large amount" of drugs that defendant obtained from other pharmacies may have contributed to the shortage determined by the NBI MEDIC. (Dkt. 104.). However, the evidence introduced at trial demonstrated that the "preexisting stock" was worth merely $5,000 and there was no record of which drugs comprised that inventory, making it impossible to know whether the "preexisting stock" consisted of any of the drugs analyzed by the NBI MEDIC. (Gregorian Decl., Exh. A. (Gov't Trial Exh. 1); Trial Tr. 212:23-213:25 (testimony of James Zee).). In addition, nothing in the trial record supports defendant's claim that a "large amount" of drugs were obtained from other pharmacies. To the contrary, the testimony introduced at trial made clear that borrowing from other pharmacies is permitted on a limited basis and only to relieve a temporary shortage to meet a patient's need, not as a means for regularly obtaining drugs for the pharmacy. (Trial Tr. 178:18-179:2 (testimony of Anna Godik); 229:13-230:5 (testimony of James Zee.) Defendant's objections to paragraphs 18, 25, and 26 of the PSR are without merit. The Court should calculate the actual loss to Medicare as $1,537,710.73.

**B.   Federal Health Care Offense**

Section 2B1.1(b)(7) of the Sentencing Guidelines provides that a 2-level enhancement applies to defendants convicted of a federal health care offense involving a government health care program if the loss is more than $1,000,000. U.S.S.G. § 2B1.1(b)(7). Here, the loss to the Medicare program, a government health care program, is $1,537,710.73 and thus this enhancement should be applied.

8

### C.   Sophisticated Means

As set forth in further detail in the government's objections to the PSR, the government submits that the Court should apply a 2-level enhancement for sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10)(C).  The application notes define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or <u>concealment</u> of an offense."  U.S.S.G. § 2B1.1, cmt. n.9(B) (emphasis added).  Notably, the enhancement "'does not require a brilliant scheme, just one that displays a greater level of planning or concealment than the usual [] case.'" <u>United States v. Jennings</u>, 711 F.3d 1144, 1147 (9th Cir. 2013) (quoting <u>United States v. O'Doherty</u>, 643 F.3d 209, 220 (7th Cir. 2011)).

Defendant's scheme to defraud Medicare included an elaborate effort to conceal the fraud through the creation of authentic-looking fake invoices.  Defendant spent significant time, effort, and money to provide the CCW with the necessary information for the CCW to create fake backdated wholesale invoices for defendant to cover the exact amount of prescription drugs defendant's pharmacy was "short." Defendant also provided edits to those fake invoices to further the false pretense that these were legitimate invoices.  The Ninth Circuit has found no error in applying the enhancement where a defendant has created false invoices to cover up unlawful payments. <u>See, e.g.</u>, <u>United States v. Tanke</u>, 743 F.3d 1296, 1307 (9th Cir. 2014) (holding the district court did not err in applying the sophisticated means enhancement where defendant attempted to cover up embezzlement by creating at least six false invoices and other records to make payments appear legitimate, stating "[t]hese means as

1  a whole were sufficiently sophisticated to support the district

2  court's decision [to apply the sophisticated means enhancement]").

3  Accordingly, the sophisticated means enhancement should be applied.

4      **D.   Abuse of a Position of Trust**

5          The government agrees with the USPO's determination in the PSR

6  that a 2-level enhancement applies for abuse of a position of trust

7  under U.S.S.G. § 3B1.3.  The Sentencing Guidelines define "a position

8  of public trust" as one "characterized by professional or managerial

9  discretion (i.e., substantial discretionary judgment that is

10 ordinarily given considerable deference)."  U.S.S.G. § 3B1.3, cmt.

11 n.1.  The Ninth Circuit has explained that "the presence or lack of

12 'professional or managerial discretion' represents the decisive

13 factor in deciding whether a defendant occupied a position of trust,"

14 and that "[a] defendant has this discretion when, because of [] her

15 special knowledge, expertise, or managerial authority, [she] is

16 trusted to exercise substantial discretionary judgment that is

17 ordinarily given considerable deference."  United States v.

18 Laurienti, 731 F.3d 967, 973 (9th Cir. 2013).  As an owner, the

19 manager, and a licensed pharmacy technician, defendant had both

20 professional and managerial discretion at her pharmacy and Medicare

21 trusted defendant's pharmacy to submit truthful claims to the

22 Medicare drug plans.  Defendant abused her position of trust by

23 submitting and causing the submission of false and fraudulent claims

24 through her pharmacy to Medicare drug plans for prescription drugs

25 that her pharmacy never dispensed to patients.  Therefore, as stated

26 in the PSR, the enhancement should be applied.  (PSR ¶ 31.)

27

28

## IV.   RESTITUTION

The Court should order defendant to pay restitution to Medicare in the amount of $1,537,710.73, which is the amount Akhtamar Pharmacy was paid by Medicare through Medicare drug plans between October 2, 2015, and June 22, 2018, based on false and fraudulent claims that defendant submitted and caused to be submitted.  This is the amount recommended in the PSR.  (PSR ¶ 107.)

### A.   The Court Must Order Restitution in this Case

Title 18, United States Code, Section 3663A mandates restitution for offenses against property under Title 18, including any offense committed by fraud or deceit, and for any offense in which an identifiable victim has suffered pecuniary loss.  Under Section 3663A, the Court must order full restitution without regard to defendant's economic situation.  18 U.S.C. § 3664f)(1)(A).  The Court shall order full and immediate payment of restitution, unless, in the interest of justice, the Court provides for payment on a date certain or in installments.  18 U.S.C. § 3572 (d)(1).  "Immediate payment of restitution is the general rule."  United States v. Martin, 278 F.3d 988, 1006 (9th Cir. 2002).  See also id. (finding that the district court did not err in following the general rule because it had information regarding the defendant's financial resources that it had "presumably considered and found insufficient to warrant periodic payments"); see generally United States v. Ross, 310 F. App'x 160, 162 (9th Cir. 2009) (finding that "immediate repayment is the rule" but that "[e]xceptions may be made in the interests of justice, such as when the defendant is not able to make more than nominal periodic payments," and the defendant carries the burden of proving such inability).

11

Here, defendant was convicted of health care fraud in violation of 18 U.S.C. § 1347, and wire fraud in violation of 18 U.S.C. § 1343, which are crimes involving fraud or deceit and crimes for which an identifiable victim has suffered pecuniary loss for purposes of Section 3663A.  Therefore, pursuant to 18 U.S.C. § 3663A, the government requests that the Court order that defendant pay $1,537,710.73 in restitution to Medicare.

While the Court shall order restitution "without consideration" of defendant's financial circumstances, 18 U.S.C. § 3664(f)(1)(A), the restitution payment order must specify the manner in which, and the schedule according to which, restitution is to be paid, by taking in consideration: (a) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; (b) projected earnings and other income of the defendant; and (c) any financial obligations of the defendant; including obligations to dependents.  18 U.S.C. § 3664 (f)(2).

Defendant bears the "burden of demonstrating" defendant's financial resources, and was obligated to "prepare and file with the probation officer an affidavit fully describing defendant's financial resources, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested . . . ."  18 U.S.C. § 3664(d)(3) and (e) (emphasis added).  As expressly set forth in Section 3664(d)(3) and (e), defendant's financial resources include assets that defendant "owns," as well as those that defendant "controls."  Thus, the Court's consideration of defendant's "financial resources and other assets" when devising a restitution payment order pursuant to § 3664(f)(2), should include

both the assets that defendant "owns" and those that defendant
"controls."

The Court's consideration under Section 3664(f)(2) is not
limited to just those resources and assets to which defendant holds
legal title at the time of sentencing.  The express language of
Section 3664 reflects that Congress intended the Court to look beyond
those assets to which defendant holds legal title when fashioning a
payment plan order.  A defendant must provide the United States
Probation Office with "an affidavit fully describing the financial
resources of the defendant, including a complete listing of all
assets owned or controlled by the defendant as of the date on which
the defendant was arrested . . . ." 18 U.S.C. § 3664(d)(3)(emphasis
added).  In reviewing the information in this affidavit, the Court
must consider all the "financial resources and other assets"
available to a defendant, including those that are "jointly
controlled."  18 U.S.C. § 3664 (f)(2)(A).[2]

**B.  Restitution Is Due and Payable Immediately, but Defendant
May Pay According to the Recommended Schedule While the
Government Pursues Other Avenues to Satisfy the Restitution
Order**

In the event the Court finds that defendant is unable to make
immediate payment of restitution in full, pursuant to 18 U.S.C.

---

[2] The specificity of the language used in the statute directs the
Court to look beyond ownership or the legal title of property when
fashioning a restitution payment order to consider all financial
resources and assets generally available to defendant.  See generally
Duncan v. Walker, 533 U.S. 167, 174 (2001) (holding that it is "a
cardinal principle of statutory construction" that "a statute ought,
upon the whole, to be so construed that, if it can be prevented, no
clause, sentence, or word shall be superfluous, void, or
insignificant."); see also United States v. Menasche, 348 U.S. 528,
538-39 (1955)("It is our duty to give effect, if possible, to every
clause and word of a statute.").

§ 3664(f)(1)-(3), this Court should order the restitution "due and payable immediately," while setting a payment schedule for the restitution.  United States v. Gunning, 339 F.3d 948 (9th Cir. 2003).  The government has reviewed the payment schedule recommended in paragraphs 92 and 93 of the Presentence Report and disagrees with the recommendation.  As set forth in the government's objections to the PSR, the government asserts that defendant's net worth should be calculated as $366,297, and that defendant's residence has a valuation of $1,050,000.  (Dkt. 103.)  Consequently, the government requests that the Court make a finding that, in the interest of justice, restitution is to be paid in installments and order an immediate payment of at least $150,000 within 30 days of entry of this judgment.

In addition, defendant is capable of making monthly restitution payments.  Approximately $6,023 of defendant's reported monthly expenses appear to be excessive, including groceries ($1,500) and housing and utilities ($4,523).  A more reasonable figure for these expenses would be approximately $3,923, i.e., groceries ($888) and housing and utilities ($3,035).[3]  If defendant's reported monthly expenses were adjusted to reflect these more reasonable amounts for just those two categories of expenses, defendant's monthly expenses would be reduced by $2,100.  Accordingly, the government requests that the Court make a finding that, in the interest of justice,

---

[3] These figures are based on the Internal Revenue Service Collection Financial Standards, which may be found at https://www.irs.gov/businesses/small-businesses-self-employed/national-standards-food-clothing-and-other-items (National); and https://www.irs.gov/businesses/small-businesses-self-employed/california-local-standards-housing-and-utilities (Los Angeles County).

14

Defendant has the ability to make monthly restitution payments of at least $2,000 per month.

The existence of a payment schedule does not preclude the government from pursuing other avenues of ensuring that defendant's restitution obligation is satisfied. See United States v. Hawkins, 392 F. Supp. 2d 757, 760 (W.D. Va. 2005); United States v. James, 312 F. Supp. 2d 802, 806-07 (E.D. Va. 2004).

To ensure the enforcement of the mandatory restitution order, as well as all of defendant's Court-ordered financial obligations, the government respectfully requests that the Court order the following:

1. Defendant shall notify the Court of any material change in defendant's ability to pay, including without limitation any increases in wages, income, or assets.

2. Defendant shall apply all monies received from income tax refunds to the outstanding Court-ordered financial obligation. In addition, defendant shall apply all monies received from lottery winnings, inheritance, judgments and any anticipated or unexpected financial gains to the outstanding Court-ordered financial obligation.

3. Defendant shall notify the Financial Litigation Section of the United States Attorney's Office for the Central District of California before transferring any interest in real property, owned directly or indirectly by defendant, including any interest held or owned under any other name or entity, including trusts, partnership and/or corporations.

4. The United States Probation Office shall preserve and provide the Financial Litigation Section of the United

States Attorney's Office for the Central District of

California with all the financial documentation relied upon

in the preparation of the Presentence Report, including any

net worth and cash flow statements completed by defendant.

## V.    ANALYSIS OF THE SECTION 3553(a) FACTORS

The federal statute governing sentencing requires district courts to take the applicable Sentencing Guidelines range into consideration when sentencing, along with other sentencing factors enumerated by Congress.  See 18 U.S.C. § 3555; United States v. Booker, 543 U.S. 220, 264 (2005) ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").  When the Court determines a sentence, "the Guidelines are the starting point and the initial benchmark." United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quotations omitted).  Once the Court calculates the defendant's Sentencing Guidelines range, it must then consider the factors set forth in 18 U.S.C. § 3553(a) to decide if they support the sentence recommended by Probation and the parties.  Id.  These factors include, among others: (a) the nature and circumstances of defendant's offense and his history and characteristics; (b) the need for the sentence contemplated to, among other things; (i) reflect the seriousness of the offense; (ii) promote respect for the law and provide just punishment for the offense; (iii) afford adequate deterrence to criminal conduct; and (iv) protect the public from further crimes of defendant; and (c) the need to provide restitution to the victim of defendant's offenses.

The government submits that the Section 3553(a) factors support a sentence of 78 months in custody for defendant.  Such a sentence

would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2), discussed further below.

### A.    Nature and Circumstances of the Offense

Defendant's crime was serious because she took advantage of the Medicare program, a taxpayer-funded program that is designed to provide critical health services to some of the most vulnerable members of society:  the elderly and disabled.  Evidence introduced at trial demonstrated that defendant submitted and caused to be submitted to Medicare drug plans false and fraudulent claims for drugs, which claims falsely represented that defendant's pharmacy dispensed prescription drugs to Medicare beneficiaries when, in fact, defendant did not purchase these drugs from prescription drug wholesalers and her pharmacy did not dispense these drugs to Medicare beneficiaries.  Defendant's scheme resulted in a loss to Medicare of $1,537,710.73 over approximately two and a half years.  Defendant then engaged in an elaborate cover-up designed to thwart future auditors who would inspect her pharmacy and potentially uncover her fraudulent scheme.

According to the Government Accountability Office, in fiscal year 2017, improper payments from Medicare, including those resulting from fraud, were estimated to be $52 billion.  See Medicare: Actions Needed to Better Manage Fraud Risks: Hearing Before the H. Subcommittee on Oversight, Committee on Ways and Means, (July 17, 2018) (statement of Seto J. Bagdoyan, Government Accountability Office).  Schemes like the one perpetuated by defendant threaten the Medicare program and jeopardize its ability to provide much needed

health care benefits to the elderly and disabled.  Thus, defendant's crime was serious and a sentence of 78 months is appropriate.

### B.   History and Characteristics of the Defendant

Defendant's history and characteristics counsel a significant sentence in this case.  See 18 U.S.C. § 3553(a)(1).  Defendant reported attending 2 years of college and having 19 years of experience as a pharmacy technician.  (PSR ¶¶ 73-75.)  Unlike many other defendants in the criminal justice system, defendant had an education and a skill set that provided her with options.  Indeed, she and her husband purchased the pharmacy that defendant operated and from which defendant paid herself a salary of approximately $5,000 per month.  (PSR ¶ 76.)  However, rather than own and operate an independent pharmacy that submitted legitimate claims to Medicare drug plans and live off a moderate salary, defendant chose to take advantage of the Medicare program by submitting false and fraudulent claims in order to line her personal coffers.

The government recognizes that defendant is a first-time offender without a prior criminal record, which is, in part, the basis for the government's low-end recommendation in this case. Notably, though, defendant's lack of a criminal history is already accounted for in the advisory guidelines range due to her criminal history category of I.  Thus, her lack of criminal history does not warrant an additional variance.

The USPO recommends a variance of 2 levels due, in large part, to defendant's mental health and defendant's exposure to domestic violence as a child.  According to the PSR, defendant reported a

history of mental and emotional health issues.  (PSR ¶¶ 67-69.)[4]  The government submits no variance is appropriate based on these arguments.  Defendant's conditions are managed with medication and counseling and there is no reason to doubt that the Bureau of Prisons can adequately accommodate defendant's mental health issues.

Defendant objects to paragraph 111 of the PSR and asserts that her "previously undiagnosed Bipolar Disorder, combined with her treatment regimen of anti-depressants, without the critical mood stabilization that she needed" distinguishes defendant's case from "typical cases" and may warrant a downward departure.  (Dkt. 104.) Section 5H1.3 of the Sentencing Guidelines provides that mental and emotional conditions are only relevant in determining whether a departure is warranted if the mental and emotional conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the Guidelines.  See U.S.S.G. § 5H1.3.

The government has not been provided with any support for defendant's assertions regarding her mental health, but even accepting the information provided in the PSR and defendant's objections to the PSR as true, there appear to be no extraordinary circumstances that distinguish defendant's case from typical cases such that it warrants a downward departure.  See, e.g., United States v. Sake, 191 Fed. App'x 401, 403 (6th Cir. 2006) (affirming sentence where district court declined to depart downward based on evidence

---

[4] Defendant objects to paragraph 68 of the PSR, alleging it omits key facts regarding defendant's mental health history and treatment. (Dkt. 104.)  The government has not been provided with any documentation to support either paragraph 68 of the PSR or defendant's objection.

introduced by defendant that defendant suffered from bipolar and "major depressive" disorder); <u>United States v. Newman</u>, 148 F.3d 871, 878 (7th Cir. 1998) (affirming sentence where district court did not find that defendant's recently diagnosed condition of bipolar disorder warranted a downward departure).

Accordingly, defendant's history and characteristics weigh in favor of a sentence of 78 months in custody.

### C. Deterrence, Promoting Respect for the Law, and Punishing Defendant for Her Crime

A sentence of 78 months is appropriate to deter others from engaging in similar illegal conduct. Individuals who are engaged in Medicare fraud schemes like defendant's make a calculated decision that the risk of being caught and punished is worth the illicit proceeds that they can obtain from the Medicare program. A sentence of 78 months will serve to affect that calculus and cause individuals to decide that the money to be gained from the Medicare program is not worth the risk of incarceration. A 78-month sentence will deter defendant and others, particularly other owners of pharmacies, from engaging in health care fraud in the future.

Defendant was the critical player in this scheme to defraud Medicare by submitting and causing the submission of false and fraudulent claims for prescription drugs she never purchased or dispensed to Medicare beneficiaries, and then attempting a cover-up. As the owner of Akhtamar Pharmacy, defendant benefitted financially from this fraud. This offense should result in a meaningful custodial sentence. By requiring defendant to spend 78 months in custody, the Court will impress upon defendant the seriousness of her

crimes and will give defendant time to reconsider her actions in light of the consequences.

Furthermore, a sentence of 78 months will promote respect for the law and will adequately punish defendant for her unlawful scheme that resulted in a loss to Medicare of at least $1,537,710.73.

## VI.   CONCLUSION

For the foregoing reasons, the government respectfully submits that sentence requested by the government is sufficient, but not greater than necessary, to provide just punishment to defendant for her crime, promote respect for the law, and deter defendant and others from committing similar crimes in the future.  See 18 U.S.C. § 3553(a).  The government thus recommends that the Court sentence defendant to 78 months imprisonment, three years of supervised release, order $1,537,710.73 in restitution, and impose a $300 special assessment.